# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| MITCHELL CURRY, ADAM DOHERTY, and FREDDIE THOMAS, JR., individually and on behalf of all others similarly situated, <br><br> v. <br><br> M-I, LLC. | **Case No. 2:18-cv-00306** <br><br><br> Judge Nelva Gonzales Ramos |

## PLAINTIFFS' RESPONSE TO M-I, LLC'S MOTION FOR DECERTIFICATION

Michael A. Josephson
Fed. Id 27157
State Bar No. 24014780
Andrew W. Dunlap
Fed Id. 1093163
State Bar No. 24078444
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Tel: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch
Fed. Id. 21615
State Bar No. 24001807
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Tel: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

**ATTORNEYS IN CHARGE FOR PLAINTIFFS**

1.   **INTRODUCTION**

Upon reading Defendant M-I, LLC's (M-I) motion, one would think that no plaintiff would ever be able to pass the decertification stage. M-I's entire motion proceeds under the false pretense that FLSA class members at the decertification stage need show that they are identically situated, rather than similarly situated. *Metcalfe v. Revention, Inc.*, 2012 WL 3930319, at *5 (S.D. Tex. Sept. 10, 2012) ("Courts have repeatedly stressed that Plaintiffs must only be similarly—not identically—situated to proceed collectively."). And **"similarly situated" is the recognized standard for collective action certification** because, of course, "Rare would be the collective action … where the employees labored under the exact same circumstances. Indeed, '[i]f one zooms in close enough on anything, differences will abound.'" *Thompson v. Bruister and Assocs., Inc.*, 967 F.Supp.2d 1204, 1220 (M.D. Tenn. 2013) (quoting *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-cv-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)) (brackets in original); *see also Rousell v. Brinker Intern., Inc.*, 441 Fed.Appx. 222, 226-27 (5th Cir. 2011) ("'[FLSA] Plaintiffs' claims need to be considered at a higher level of abstraction.' [D]istinctions must make a difference relevant to the legal issues presented." (quoting *Frank*, 2007 WL 2780504, at *4)).

There should be no question regarding collective certification in this FLSA case. After all, "a court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy or practice." *Pedigo v. 3003 South Lamar, LLP*, 666 F.Supp.2d 693, 698 (W.D.Tex. 2009) (quoting *Ryan v. Staff Care, Inc.*, 497 F.Supp.2d 820, 825 (N.D.Tex.2007) (additional citations omitted). M-I's decertification effort conflicts with how it actually treats its workers. Despite the allegedly "wide variations" in job duties that Plaintiffs perform, M-I uniformly treats all Drilling Fluid Specialists (DFSs) as independent contractors and pays them a day rate with no overtime. M-I makes no effort to analyze the job duties performed by any particular Plaintiff to determine whether that worker legitimately falls

outside the FLSA's broad definition of "employee." Instead, M-I determined that DFSs *as a class* are properly classified as independent contractors.  It is "disingenuous" for M-I to "generally decide that all [DFSs]" are independent contractors but claim "plaintiffs cannot proceed collectively to challenge" that decision. *Pendlebury v. Starbucks Coffee Co.*, 518 F.Supp.2d 1345, 1352 (S.D. Fla. 2007) (denying decertification) (quoting *Nerland et al. v. Caribou Coffee Company, Inc.,* 564 F.Supp.2d 1010, 1024 (D.Minn. 2007)). M-I's Motion for Decertification should be denied.

2.    **LEGAL STANDARD**

At this stage of the proceedings, Plaintiffs bear the burden to show that they are similarly situated.  *Kautsch v. Premier Comm'ns*, 06-CV-04035-NKL, 2008 WL 294271, at *1 (W.D. Mo. Jan. 31, 2008). This burden is not a heavy one and in fact, is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095-96 (11th Cir. 1996).[1] And, although heightened at the decertification stage, the "similarly situated" requirement of § 216(b) is still considerably less stringent than the commonality requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure. *White v. NTC Transp., Inc.*, 4:11CV007-SA-JMV, 2013 WL 5874566, at *2 (N.D. Miss. Oct. 31, 2013).

The Court does not evaluate the merits of Plaintiffs' claims at the decertification stage. V*aughn v. Document Grp. Inc.*, 250 F. Supp. 3d 236 (S.D. Tex. 2017) ("Neither stage of certification is an opportunity for the court to assess the merits of the claim by deciding factual disputes or making credibility determinations."); *McKnight v. D. Houston, In*c., 756 F. Supp. 2d 794, 802 (S.D. Tex. 2010) (same); *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 83 (D. Conn. 2009) ("Notably, even at the second step of the certification stage, courts do not address the merits of the plaintiffs' claims.

---

[1]    Although at the first stage of the "similarly situated" determination the standard is "lenient," the second stage is not as heavy a burden as M-I urges. The second stage is simply "less lenient" than the notice stage. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001); *Pendlebury*, 518 F. Supp. 2d at 1348.  Courts have felt no need to specify exactly how much "less lenient." *See Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).

Such an inquiry is irrelevant at the certification stage, as long as plaintiffs assert a plausible basis for their claims."). Similarly, the Court does not address the merits of defendant's defenses, but rather looks only to "whether the defenses asserted will be so individualized as to merit decertification." *Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1069 (N.D. Ind. 2012). Ultimately, "[t]he decision to certify or decertify a collective action under section 216(b) is soundly within the district court's discretion." *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348-49 (S.D. Fla. 2007); *see also Gardner*, 2013 WL 1629299, at *4 ("The decertification process ... appears to be largely in the Court's discretion.") (quotation omitted); *Stevens v. HMSHost Corp.*, 10 CV 3571 ILG VVP, 2014 WL 4261410, at *5 (E.D.N.Y. Aug. 27, 2014) *appeal denied,* 2015 WL 926007 (E.D.N.Y. Mar. 4, 2015).

3.    **M-I HAS ADMITTED THAT PLAINTIFFS ARE SIMILARLY SITUATED**

   A.    **M-I's Corporate Rep Admitted that the Job Duties of Plaintiffs' Subgroups are Similar**

   M-I's corporate rep, Ben Fullmer, testified to the following:

> 19 **Q. (By Mr. Liles) Are there any difference in the**
> 20 **job duties between the drilling fluids W-2 employees and**
> 21 **the drilling fluids contract workers?**
> 22 A. The job scope is -- is the same.

Exh. 1, Deposition of Ben Fullmer (Fullmer Depo), at 50:19-22. When MI admits IC DFSs [as a group] perform the same job duties as employee DFSs [as a group], it is by definition admitting that the basic job duties of DFSs are uniform across all DFSs. Thus, M-I admits that DFSs as a group have the same job duties. This admission belies DFS's argument that Plaintiffs' job duties require individual analysis.

   B.    **M-I Demonstrates Through its Own Actions that Plaintiffs are Similarly Situated**

   M-I says individualized inquiries about each Plaintiff will be required for M-I to establish Plaintiffs' exempt status, but M-I's actions beg to differ with this position. Courts deny decertification in misclassification cases like this one, in part, because of the employer's uniform

3

classification decision that failed to consider each employee's individual circumstances. *See, e.g., Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674, 690 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016); *Morrison v. Ocean State Jobbers*, 290 F.R.D. 347, 359 (D. Conn. 2013) (finding defendant's decision to blanketly classify the job position as exempt is relevant to deciding whether plaintiffs were similar in relevant ways regarding the exemption); *Pendlebury*, 518 F.Supp.2d at 1352-53 (S.D. Fla. 2007) (finding the employer's decision to classify all store managers as exempt based on the "job itself," without an individualized finding, was relevant to the plaintiffs' similarly situated status). M-I's attempt to distinguish class members post-litigation can be dismissed out of hand for what it is. *See Nerland*, 564 F. Supp. 2d at 1024 ("The Court finds it disingenuous for [Defendant], on one hand to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that plaintiffs cannot proceed collectively to challenge the exemption.").

### 4.    M-I's Motion Improperly Focuses on Merits Arguments

M-I's motion focuses primarily on merits, arguing that *Faludi v. US Shell Solutions, LLC*, __ F.3d __, 2019 WL 3940878 (5th Cir. Aug. 21, 2019) establishes many of the plaintiffs are exempt "Highly Compensated" employees, 29 C.F.R. § 541.601, and that *Parrish v. Premier Directional Drilling, LP*, 917 F.3d 369 (5th Cir. 2019), which dealt with Directional Drillers, somehow establishes that DFSs are properly classified as independent contractors.

Even if M-I were correct regarding the impact of these two cases on the merits (which it isn't), it would simply mean that the class or subclasses impacted by these arguments would be decided in M-I's favor. Indeed, M-I's arguments regarding the impact of these cases is entirely **inconsistent** with its decertification argument because M-I itself claims these two cases apply to defeat the claim of all or a large group of the Plaintiffs.[2] These are arguments "not for refusing to

---

[2] In fact, the *Parrish* case proceeded collectively both in the trial court and on appeal. *Parrish*, 917 F.3d at 377.

certify the class but for certifying it and then entering a judgment that will largely exonerate [M-I]—a course it should welcome[.]" *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012), *cert. granted, judgment vacated,* 569 U.S. 1015 (2013), *reinstated,* 727 F.3d 796 (7th Cir. 2013). M-I admits the claims of the class or subclasses can be resolved on a global, not an individual, basis.

5.   **EVEN ON THE MERITS, M-I IS WRONG**

    **A.   *Faludi* is Not Final**

M-I argues the recent Fifth Circuit opinion in *Faludi* establishes Plaintiffs paid a day-rate amounting to more than $455 per day were guaranteed payment on a salary basis and are, thus, exempt under the test for Highly Compensated Employees. At the outset, *Faludi* is not a final decision, as the plaintiff filed a petition for rehearing en banc on September 18, 2019. *Faludi*, No. 17-20808, Doc. 00515123792, at *1 (5th Cir. Sept. 18, 2019).

There is a high likelihood that the *Faludi* panel majority opinion will be altered *en banc* because, as explained in Judge Ho's cogent dissent, the majority opinion is simply wrong. *See Faludi*, 2019 WL 3940878, at *5-7 (Ho, J., dissenting). The *Faludi* majority is first wrong in its determination that, because the plaintiff in that case was paid a day rate of more than $455 per day, he was thus guaranteed a salary of at least $455 in any week in which he performed any work. *Faludi*, 2019 WL 3940878, at *3. As explained by Judge Ho in his dissent, "As the majority correctly notes, U.S. Shale paid Faludi on a daily, not weekly, rate. Faludi did not 'regularly receive' a 'predetermined amount' on a weekly basis. Instead, his pay depended on the number of days he worked. U.S. Shale creatively argues that Faludi's daily rate of $1,000 can be recharacterized as a *weekly* rate of *at least* $1,000, so long as he works at least one day a week. But that does not alter the fact that Faludi receives a 'predetermined amount' on a daily basis, and not 'on a weekly, or less frequent basis.' Nor can I reconcile U.S. Shale's theory with the requirement that 'an exempt employee must receive the *full*

*salary* for any week in which the employee performs any work *without regard to the number of days or hours worked.*'" *Faludi*, 2019 WL 3940878, at *6 (emphasis in original).

The *Faludi* majority is also wrong in suggesting the "reasonable relationship" test of 29 C.F.R. § 541.604(b) does not apply to the salary basis test as applied to Highly Compensated Employees. *Faludi*, 2019 WL 3940878, at *4. Judge Ho, in his dissent, explains why the binding regulations preclude this interpretation. "According to U.S. Shale, the 'guaranteed' 'weekly required amount' is $1,000. But that weekly guarantee does not have a 'reasonable relationship' with Faludi's total compensation of approximately $260,000, as the regulations make clear. *See* 29 C.F.R. § 541.604(b) ('The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek. Thus, for example, if the weekly salary level is $913, an exempt employee guaranteed compensation of at least $1,000 for any week in which the employee performs any work, and who normally works four or five shifts each week, may be paid $300 per shift without violating the salary basis requirement.')." *Faludi*, 2019 WL 3940878, at *6. *Faludi* also ignores the requirement to consider the application of the *Auer* deference doctrine, where courts **must** give deference to the Department of Labor's (DOL) interpretation of its own regulations if those regulations are ambiguous. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

### B.  *Faludi* is Distinguishable

*Faludi* is also distinguishable on the facts. In *Faludi*, the parties had a written agreement that guaranteed the plaintiff pay that exceeded $455.00 for any week in which he worked. Here, there is no written agreement and even though some Plaintiffs may have periodically received a day-rate from M-I exceeding $455, the evidence shows their day-rates fluctuated and thus were not predetermined nor guaranteed to not drop below $455 per day as M-I contends. *Jordan v. Helix Energy Solutions Grp., Inc.*, 346 F.Supp.3d 890, 903-04 (S.D. Tex. 2018). *See,* Exhibit 2 (Chart of

Plaintiffs' Fluctuating Pay). Thus, M-I cannot establish Plaintiffs received a "salary" for all weeks in which they performed work without regard to the number of days or hours worked, or that M-I complied with the reasonable relationship test, as required.

### C. Even if *Faludi* Survives, It Would Only Apply to Plaintiffs Eligible for the Highly Compensated Employee Test.

#### 1) *Faludi* Only Applies to "Highly Compensated Employees."

*Faludi* has no application to Plaintiffs who are not eligible for the Highly Compensated Employee test. While *Faludi* held that an employee paid on a day rate of $455 or more satisfies the minimum guarantee requirement of 29 C.F.R. § 41.604(b), it also limited its holding regarding the "reasonable relationship" requirement to employees subject to the test for Highly Compensated Employees. Thus, any Plaintiff who receives a day rate of at least $455 but does not meet the minimum **annual** compensation requirement of $134,004 would have to meet the reasonable relationship test, which Plaintiffs would not do. Fullmer Depo, at 52:1-14 (discussing three schedules that can be worked by DFSs: two week on/two week off; three week on/one week off; and, 20 days on/10 days off).

#### 2) M-I Misstates the Minimum Annual Compensation Required for Highly Compensated Employees for Most of the Pertinent Time Period.

Throughout its Motion, M-I refers to the minimum salary requirement for the Highly Compensated Employees as $100,000. What M-I ignores (despite being told otherwise by courts), however, is that since December 1, 2016, the minimum annual compensation requirement for Highly Compensated Employees has been $134,004. *Wilson v. Schlumberger Tech. Corp.*, No. 17-CV-00281-RBJ, 2019 WL 1916200, at *2 (D. Colo. Apr. 24, 2019) (annual compensation threshold is currently set at $134,004); *Coates v. Dassault Falcon Jet Corp.*, No. 4:17CV00372 JLH, 2018 WL 6253779, at *2 (E.D. Ark. Aug. 13, 2018) (total annual compensation requirement was $100,000

annually before December 1, 2016, and $134,004 afterwards); *Alavar v. Trican Well Serv., L.P.*, No. 5:16-CV-00014-RCL, 2019 WL 4060879, at \*16 (W.D. Tex. Aug. 28, 2019) (same).

This is a common misconception caused by the confusion surrounding the injunction against enforcement of other salary basis regulations promulgated at the same time. When the Department of Labor amended the Highly Compensated Employee regulation to increase the annual compensation requirement from $100,000 to $134,004 to be effective December 1, 2016, it at the same time amended the regulation regarding the salary basis minimum weekly salary level, increasing that amount from $455 to $921 per week. Twenty-one states filed a motion for preliminary injunction seeking to prevent the Department of Labor from enforcing the regulation amending the minimum weekly salary level for exempt employees. *Nevada v. United States Dep't of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016). The plaintiffs in that case did not, however, challenge the amendment of the regulation increasing the annual compensation requirement for the Highly Compensated Employee test. *Id.* The *Nevada* court issued an injunction against the enforcement of the regulation amending the minimum weekly salary level for exempt employees. *Nevada*, 218 F. Supp. 3d at 534 ("Defendants are enjoined from implementing and enforcing the following regulations as amended by 81 Fed. Reg. 32,391; 29 C.F.R. §§ 541.100, 541.200, 541.204, 541.300, 541.400, 541.600, 541.602, 541.604, 541.605, and 541.607."). The court did NOT enjoin the implementation and enforcement of the regulation amending the annual compensation requirement for Highly Compensated Employees, 29 C.F.R. § 541.601. Thus, even if *Faludi* survives as is, it will only apply (if it applies at all) to seven Plaintiffs (and not to every year as to all seven of those Plaintiffs).

### 3) *Faludi* Does Not Apply to Plaintiffs Paid a Day Rate Less than $455

Even if the panel majority opinion in *Faludi* stands as is, that opinion's holding – that a day rate of $455 constitutes a guaranteed salary of at least $455 in any week in which the employee

perform any work – cannot be applied to any Plaintiff who is paid a day rate of less than $455. M-I suggests in its Motion that *Faludi* can be applied to Plaintiffs who earn a day rate as small as $228 since "they meet the minimum salary requirements for an exempt employee as long as they have an agreement to perform work at least two days per week." ECF No. 162, at p. 7.

M-I's argument completely misconstrues the reasoning (albeit flawed) of the panel majority in *Faludi*. An employee paid on a salary basis is not entitled to payment of any amount in a workweek in which s/he performs no work. 29 C.F.R. § 541.602(a) ("Exempt employees need not be paid for any workweek in which they perform no work."). Thus, the *Faludi* majority reasons, because the plaintiff in that case would be paid more than $455 in any week in which he performed *any* work (at least a portion of one day), he was therefore guaranteed to receive more than $455 in any week in which he performed any work. Accordingly, *Faludi* applies only when an employee is paid a day rate of $455 or more so that the employee receives the minimum salary level for any workweek in which he performs *any* work. Its reasoning cannot be extended beyond the day rate received for a single day.

M-I's argument here essentially attempts to equate a schedule with a "guarantee." However, a schedule is not, and has never been a guarantee. Taken to its extreme, M-I's argument would mean that even an hourly employee paid $15 per hour would be considered salaried if he were scheduled to work 40 hours per week ($15 x 40 = $600), regardless of whether he was paid for scheduled hours he did not work. The fact that Plaintiffs were expected to work a certain schedule does not equate to a "guarantee." "Nor can it be said that because an employee was expected to work a certain schedule that he was in any sense guaranteed a certain compensation." *Retail Store Emp. Union, Local 400 v. Drug Fair-Cmty. Drug Co.*, 307 F. Supp. 473, 479 (D.D.C 1969) (pharmacists were not salaried where they were merely "guaranteed a bi-weekly work schedule of 99 hours") (cited with approval by *Usery v. Associated Drugs, Inc.*, 538 F.2d 1191, 1194 (5th Cir. 1976)).

### D.  The Impact of *Faludi* Can Be Dealt with by Subclasses

Whatever the final ruling in *Faludi* turns out to be, it will impact the claims of the Plaintiffs as groups. The Court's analysis of how *Faludi* applies to Plaintiffs' claims will not be made on a "plaintiff-by-plaintiff" basis. *Faludi* will apply to objectively identifiable groups of Plaintiffs uniformly. For example, if the panel majority opinion in *Faludi* stands, then the impact of that case on the salary basis issue will fall uniformly on identifiable subclasses:

> (1)  Plaintiffs paid a day rate of $455 or more who meet the annual compensation requirement for Highly Compensated Employees;
> (2)  Plaintiffs paid a day rate of $455 or more who do not meet the annual compensation requirement for the Highly Compensated Employees; and,
> (3)  Plaintiffs paid a day rate of less than $455.

### E.  The *Parrish* Facts Have No Application to this Court's Determination Regarding Employee Status in This Case

M-I broadly argues all DFSs in this case should be properly classified as independent contractors based on the Fifth Circuit's recent decision in *Parrish*. M-I's argument completely misses the mark in the first instance since *Parrish* dealt with Directional Drillers, not DFSs. Moreover, the Fifth Circuit decided *Parrish* at the summary judgment stage, following the completion of extensive discovery relating to the economic realities of the parties' employment relationship, and limited its decision to the specific facts of the *Parrish* collective action plaintiffs. Based on a substantial record, the Fifth Circuit undertook a fact-intensive inquiry, applied the economic realities factors to the evidence, and ultimately determined the totality of the circumstances presented favored independent contractor status for **that** (collective) group of plaintiffs. *See Parrish*, 917 F.3d at 375-77, 381-87.

As *Parrish* noted, the economic realities factors "should not be applied mechanically." *Parrish*, 917 F.3d at 380. Thus, even after the *Parrish* ruling, courts in this Circuit must still analyze the economic realities factors of an employment relationship as they relate to the specific facts at issue. *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 360 F. Supp. 3d 571 (W.D. Tex. 2019); *Clay v. New Tech Glob. Ventures, LLC*, No. CV 16-296-JWD-CBW, 2019 WL 1528426, at *1-2 (W.D. La. Apr. 8, 2019). In

*Clay*, a case alleging an oilfield staffing company misclassified workers as independent contractors, the employer moved for leave to file summary judgment following the Fifth Circuit's decision in *Parrish. Clay*, 2019 WL 1528426 at *1. The Court specifically rejected the employer's contention that Parrish was a "game changer" which "clarified the law in a number of ways" and "involved facts that are nearly identical to the facts [in *Clay*]." *Id.* at *1, n.1. The Court noted, "*Parrish* did not change the landscape of Fifth Circuit law" and further stated "[w]hile *Parrish* may be 'legally and factually on point' … it did not overrule any prior Fifth Circuit case nor represent a paradigm shift in the world of FLSA law." *Id.* at *1. The Court refused to bar the workers' claims based on the *Parrish* ruling alone, noting "[*Parrish*] included several facts that are distinguishable from those in the case at hand," such that "its bearing on the case before the Court is subject to debate – and far more so than [the employer] urges in its motion." *Id.*

6. **PLAINTIFFS' EMPLOYEE STATUS CAN BE DETERMINED COLLECTIVELY (AS IT WAS IN *PARRISH*)**

The FLSA's definition of "employee" is broad. The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The statute in turn defines "employ" as "to suffer or permit to work," *Id.*, § 203(g), and "employer" to include "any person acting directly or indirectly in the interest of an employer." *Id.* § 203(d). The employment relationship is particularly broad, defined with "striking breadth" so as to "stretch . . . the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992); *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008). "The common law concepts of 'employee' and 'independent contractor' have been specifically rejected as determinants of who is protected by the Act." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976); *Parrish*, 917 F.3d at 379 (accord).

"[O]f all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee'." *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985);

11

*Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir. 1984); *see also Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir. 1993); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058 (2d Cir. 1988). The statutory definitions "are necessarily broad to effectuate the remedial purposes of their act." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991). The "striking breadth" of the definition of employment under the FLSA derives from the fact that a firm is an employer for FLSA purposes if it suffers or permits a person to be employed. *Darden*, 503 U.S. at 326; *accord U.S. v. Rosenwasser*, 323 U.S. 360, 362 (1945) ("A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."); *Kenney v.  v. Helix TCS, Inc.,* --- F.3d---, 2019 WL 4557433, at *3 (10th Cir. Sept. 20, 2019) ("the Supreme Court has emphasized the 'striking breadth; of the FLSA's definition of employee, which is purposefully expansive to maximize the full reach of the Act"); *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1543 (7th Cir. 1987) ("The definition, written in the passive, sweeps in almost any work done on the employer's premises, potentially any work done for the employer's benefit or with the employer's acquiescence.").

Whether a worker is an employee under the FLSA is ultimately a question of law. *Hiser v. NZone Guidance, LLC*, No. 1:18-CV-1056-RP, 2019 WL 2098111, at *2 (W.D. Tex. Apr. 24, 2019) (citing *Brock v. Mr. W Fireworks*, 814 F.2d 1042, 1045 (5th Cir. 1987)). "Given the remedial purposes of the [FLSA], an expansive definition of 'employee' has been adopted by the courts." *Id.* (quoting *Usery*, 527 F.2d at 1311). To evaluate whether an employer-employee relationship exists, courts must determine "whether the alleged employees, as a matter of 'economic reality,' are 'economically dependent' on the business to which they supply their labor and services." *Id.* (quoting *Brock*, 814 F.2d at 1043). In FLSA actions, the Fifth Circuit relies on five, non-exhaustive factors provided in *United States v. Silk*, 331 U.S. 704 (1947), to guide this inquiry: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the

alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency

of the relationship." *Id.* (quoting *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008)).

Contrary to the assertions of M-I, none of these issues require individualized inquiries.[3]

### **_Degree of Control_**

It is clearly relevant that M-I had employee DFSs performing the exact same jobs in the

exact same ways as its purported contractor DFSs. Fullmer Depo, at 50:19-22; *Parrish*, 917 F.3d at

386 (noting this fact is relevant); *Brock*, 840 F.2d at 1058 (significant that employee nurses perform

exactly the same work as independent contractor nurses); *Herman v. Davis Acoustical Corp.*, 21

F.Supp.2d 130, 134 (N.D.N.Y. 1998), *rev'd on other grounds*, 196 F.3d 354 (2nd Cir.1999) (same).

Moreover, M-I's corporate reps testified M-I exercised the following control over DFSs

without regard to any individualized factors:

- M-I's contractor DFSs did the same work under the same conditions as its employee DFSs. M-I's Corporate Representative Ben Fullmer confirmed that contractor DFSs had the same job duties (Fullmer Depo, at 50:19-22), same schedule (Fullmer Depo, at 55:4-8), subject to the same safety standards (Fullmer Depo, at 59:19-21), marketed to M-I's clients the same (Fullmer Depo, at 145:22-146:18), and that there were no differences in job performance based on location worked (Fullmer Depo, at 129:23-130:1).
- Nothing changed for those DFSs who were "swapped" from employee to contractor treatment.[4] Fullmer Depo, at 51:6-19; Exh. 3, Deposition of Craig Adels (Adels Depo), at 11:5-18.
- M-I dictated the manner in which DFSs performed their work and obligated the DFSs to follow the policies and procedures of the oilfield services companies to which M-I assigned them and to perform their work. Fullmer Depo, at 131:12-22, 136:18-138:3.
- M-I regularly dictated what it expected from its DFSs. *Id.*
- M-I maintained the right to observe and inspect the work performed by its DFSs to ensure the work was being performed in accordance with M-I's policies, procedures, and other requirements. Fullmer Depo, at 147:23-148:4.
- M-I assigned IC DFSs to its job sites for its clients. Fullmer Depo, at 128:25-129:2.

---

[3] The WTS "questionnaires" referenced by M-I in its Motion are irrelevant to any issue before this Court. M-I admits that these "questionnaires" were part of the onboarding process. Thus, these "questionnaires" were completed *before* Plaintiffs began work for M-I. Accordingly, the responses to these "questionnaires" had nothing to do with the Plaintiffs' employment relationship with M-I. As such, these responses are meaningless to any issue to be determined by this Court.

[4] *Id.* 51:6-19; Ex. 2, 11:5-18

- M-I placed each IC DFS under the supervision of a M-I Field Service Manager. Fullmer Depo, at 28:16-20, 108:18-24, 148:22-149:17; Adels Depo, at 24:22-25:2.
- M-I ensured IC DFSs followed the mud plan. Fullmer Depo, at 122:8-123:2.
- M-I ensured IC DFSs M-I's followed M-I's policies and procedures. Fullmer Depo, at 55:19-59:25.
- M-I's Field Service Managers provide the same supervision to employee and IC DFSs alike.  Fullmer Depo, at 28:16-20, 134:6-10.
- M-I's IC DFSs were not exempt from M-I's rigorous training requirements. Fullmer Depo, at 67. Plaintiffs were required to complete mandatory training modules in the exact same manner as M-I's employee DFSs. Fullmer Depo, at 105, 119.

Additionally, there are no facts to suggest Plaintiffs exerted such a degree of control as to constitute a separate economic entity. *Karna v. BP Corp. N. Am.*, No. CIV.A. H-12-0101, 2013 WL 1155485, at *8 (S.D. Tex. Mar. 19, 2013), *opinion vacated in part on denial of reconsideration,* 11 F. Supp. 3d 809 (S.D. Tex. 2014), *aff'd,* 609 F. App'x 814 (5th Cir. 2015). For instance, there is no indication that Plaintiffs could control how much work they did for M-I in a given week. Fullmer Depo, at 52:1-14 (discussing schedules M-I sets for DFSs). Similarly, there is no suggestion that Plaintiffs controlled any "meaningful economic aspects" of the business. *See Hopkins,* 545 F.3d at 343–44 (finding control factor weighed in favor of employee status where sales leaders could not control personnel issues, advertising, the type or price of products they sold, or the number of sales leads they would receive); *Chapman v. A.S.U.I. Healthcare of Tex., Inc.,* No. H–11–3025, 2012 WL 3614187, at *4 (S.D. Tex. Aug.21, 2012) (finding control factor weighed in favor of employee status where defendant controlled all meaningful aspects of the home healthcare business, such as selecting clients, selecting residences, and hiring staff, and plaintiffs, the care providers, were simply assigned to houses and shifts); *Martin v. Priba Corp.,* No. 3:91–CV–2786–G, 1992 WL 486911, at *4 (N.D. Tex. Nov. 6, 1992) (refusing to find independent contractor status where dancer's "economic status [is] inextricably linked to those conditions over which defendants have complete control," such as timing of performances, atmosphere in club, and advertising). Of course, all of these factors going to

the degree of control element of the economic realities test can be determined without individualized inquiries.

### *Relative Investment*

The relative investment element can likewise be determined without any individualized analysis. To determine the degree of economic independence, the Court must measure the investment of the individual worker compared to the investment of the purported employer. *See Hopkins*, 545 F.3d at 344. If the employer has provided a significant amount of risk capital and the worker has provided only a minimal investment, an employer-employee relationship is more likely to be found. *Id.* Here, there is no question that M-I's investment in its drilling fluids services far surpasses the limited investment, if any, made by its DFSs. In contrast to the substantial investment made by M-I, DFSs' investments were limited to their boots. Fullmer Depo, at 60:5-64:18. Fullmer, M-I's corporate representative, was wholly unaware of *any costs*—other than boots—incurred by IC DFSs that are not paid for by M-I. Fullmer Depo, at 127:7-22, 156:5-14, 153:24-154:8. Fullmer conceded that the relative investment isn't even close. Fullmer Depo, at 184:20-185:3. No individual determinations are required.

### *The Degree to Which Plaintiffs' Opportunity for Profit or Loss is Determined by M-I*

Profit is "the gain realized from a business over and above its expenditures." *Brock v. Lauritzen*, 624 F. Supp. 966, 968 (E.D. Wis. 1985). Where the only "'expenditures' from which the [workers] obtain a return is on their own labor . . ., [s]uch returns of this type are more properly classified as wages, not profits." *Mr. W Fireworks, Inc.*, 814 F. 2d at 1050; *Richardson v. Genesee County Community Mental Health*, 45 F.Supp.2d 610, 614 (E.D. Mich. 1999).

In this case, Plaintiffs received a daily rate in return for their labor. Accordingly, they have no opportunity to experience profit, or to experience a loss, as a result of their employment. Payment by the day eliminates opportunity for profit or loss and indicates employee status. *See, c.f.,*

*Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 751 (N.D. Ill. 2011) (payment by the hour does not equate to opportunity for profit); *Baker v. Barnard Const. Co. Inc.*, 860 F. Supp. 766, 773 (D.N.M. 1994), *aff'd sub nom. Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436 (10th Cir. 1998) (the presence of a fixed hourly wage eliminates the opportunity for the worker to experience a loss); *Gayle v. Harry's Nurses Registry, Inc.*, No. CV074672CPSMDG, 2009 WL 605790, at *3 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714 (2d Cir. 2014) (That plaintiff would "profit" more if she had worked more hours does not mean that she had an opportunity for profit. Her pay was not contingent on the success of the company or the excellence of her work. She was paid an hourly wage).

Moreover, where the employer exercises control over the plaintiff's schedule and pay, the effect is to severely limit the opportunity for profit or loss by the plaintiff. *Cromwell v. Driftwood Contractors, Inc.*, 348 Fed. Appx. 57, 61 (5th Cir. 2009). Here, M-I controlled both Plaintiffs' schedule and their rate of pay. Fullmer Depo, at 52:1-14.

Similarly, where, as a practical matter, the work schedule established by the employer prohibits plaintiffs from taking other jobs while working for the employer, the plaintiffs are precluded from taking on significant extra work, thus further limiting the plaintiff's opportunity for profit or loss. *Id.* It does not matter whether the plaintiff is contractually prohibited from taking other jobs; the courts focus on what actually happened as a practical matter. *Id.* The Plaintiffs in this case were, because they were scheduled for 12 hour shifts (or 24 hour on-call shifts) they were personally obligated to perform, as a practical matter prohibited from taking other work while working for M-I. Fullmer Depo, at 52:1-14

An independent contractor is generally free to seek out business opportunities. Independent contractors often advertise, maintain a visible business location, and are available to work in the relevant market. Indeed, the independent contractor's economic prosperity depends on doing so

successfully.  But in the case of the Plaintiffs, M-I requires Plaintiffs to work full-time, making themselves available from 60 to over 80 hours per week. Fullmer Depo, at 52:1-14   All of these factors are applicable to Plaintiffs as a group and require no individualized determinations.

### Skills and Initiative

"The skill and initiative that evidence independence cannot include routine duties or responsibilities normally expected of an employee in the same position." *Hopkins v. Cornerstone America,* 512 F.Supp.2d 672, 691 (N.D. Tex. 2007). "Rather, skill and initiative should demonstrate independent entrepreneurism." *Id.*. M-I has admitted that its IC DFSs provide no special skill or initiative not expected of M-I's employees in the same position. Fullmer Depo, at 50:19-22. This factor, like the others, requires no individualized determinations.

### Permanence of Employment Relationship

The duration of employment factor is rarely one that can be determined without some individualized determinations. After all, not all employees stay with an employer for identical periods of time. However, Courts must make allowances for a business' operational characteristics that are unique or intrinsic to the particular business or industry and to the workers the business employs. *Mr. W Fireworks, Inc.*, 814 F.2d at 1054; *Mitchell v. John R. Cowley & Bro, Inc.*, 292 F.2d 105, 108 (5th Cir. 1961). In situations where the workers at issue are transient by nature, the proper test for determining permanency of the relationship is not whether the alleged employees returned from job-to-job, but whether the alleged employees worked for the entire operative period of a particular job. *See Mr. W Fireworks, Inc.*, 814 F.2d at 1054. Workforces have been deemed employees where the lack of permanence is due to the "nature of the business," rather than "to the workers' own business initiative." *Id.* at 1047, 1053-1054 ("Courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry."); *Superior Care, Inc.*, 840 F.2d at 1060-61. It is undisputed Schlumberger engaged its IC DFSs in long-term employment.

Beauchamp Depo, at 89:23-90:16. In the context of M-I's business, the fact that some of the Plaintiffs may have had shorter terms of employment is irrelevant to the economic realities inquiry. Particularly since an assessment of economic dependence is a "totality of the circumstances test" in which no one factor is determinative. *Brock*, 814 F.2d at 1043–44.

### DFSs are an Integral Portion of M-I's Business

Courts also routinely consider one other factor relevant to the economic reality test – whether the services provided by the employee to the employer are "an integral part of the employer's business." *Verma v. 3001 Castor, Inc.*, No. 18-2462, 2019 WL 4125220, at *7 (3d Cir. Aug. 30, 2019); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984); *Jones v. Shac LLC*, No. 215CV01382RFBNJK, 2019 WL 4246681, at *9 (D. Nev. Sept. 6, 2019).

Plaintiffs are an integral part of M-I's business, which strongly indicates an employment relationship here. *Brandel*, 736 F.2d at 1117; *Verma*, 2019 WL 4125220, at *7. M-I cannot provide Drilling Fluids services to its clients – which is the primary component of its overall operations – without DFSs. This additional factor, like the other economic reality factors, can be determined without individualized inquiries.

7. **APPLICATION OF THE SALARY BASIS TEST TO THIS CASE DOES NOT REQUIRE INDIVIDUAL INQUIRIES**

In its Motion, M-I only argues that the Salary Basis Test is at issue with regard to Highly Compensated Employees due to *Faludi*. The Highly Compensated Employee test can only possibly apply to Plaintiffs who received a day rate of at least $455 **and** who received annual compensation of at least $100,000 (for 2015 and/or 2016) or $134,004 (for 2017 and/or 2018). Thus, the Highly Compensated Employee test can only possibly apply to seven of the Plaintiffs. Any Plaintiff receiving a day rate of less than $455 does not have a guaranteed weekly salary of at least that amount. This, of course, assumes that *Faludi* survives as is. If *Faludi* is overturned *en banc*, then the

Highly Compensated Employee test will apply to no Plaintiffs since M-I cannot establish that any

Plaintiff was paid on a salary basis.

Should *Faludi* survive as is, the seven Plaintiffs to whom the Highly Compensated Employee

test might possibly apply can be separated into their own subclass and the proper determinations can

be made as to whether they are exempt. A similar determination can be made regarding the subclass

of the remaining Plaintiffs. These determinations can be made on a group basis without

individualized inquiries.

**8.   APPLICATION OF THE ADMINISTRATIVE EXEMPTION DOES NOT REQUIRE INDIVIDUAL
INQUIRIES**

The first of M-I's claimed exemptions, the Administrative Exemption, requires proof of two

"duties" tests: (1) the employee's "primary duty is the performance of office or non-manual work

directly related to the management or general business operations of the employer or the employer's

customers," and (2) the employee's "primary duty includes the exercise of discretion and

independent judgment with respect to matters of significance." 29 CFR § 200(a)(2)&(3). M-I bears

the burden of proving the Administrative Exemption. *Thomas v. Speedway Super America, LLC,* 506

F.3d 496, 501 (6th Cir. 2007) ("FLSA overtime exemptions are 'affirmative defense[s] on which the

employer has the burden of proof . . . [t]he defendant must establish through 'clear and affirmative

evidence' that the employee meets every requirement of an exemption"). If M-I fails to carry its

burden with regard to either of these two "duties" tests, the exemption does not apply. *Elvis Presley

Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991); *Ely v. Dearborn Heights School District

No. 7,* 2015 WL 8608493, at *4 (E.D. Mich. 2015).

The first duty requirement contains two distinct issues, both of which are common to the

requested sub-classes. First, the Plaintiffs' primary duty must be the performance of office or non-

manual work. This issue can be determined on a group basis. M-I admits as much when it argues in

its Motion that *Parrish* holds that <u>all</u> DFSs perform office or non-manual work. Next, the Plaintiffs'

primary duty must be "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). M-I in its Motion simply states without explanation or citation to authority that the Plaintiffs performed work directly related to the general business operations of its customers. However, a closer examination of the regulations, case law, and DOL authority demonstrates both that Plaintiffs' primary duty is not "directly related to the management or general business operations of the employer or the employer's customers" and that this is an issue that can be determined on a group basis.

There is an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir.2009); *Smith v. Frac Tech Servs., LLC*, 2011 WL 96868, *23 (E.D. Ark. Jan. 11, 2011) (granting summary judgment to plaintiff Field Engineers on administrative exemption where plaintiffs participated in providing the very service that their employer sold to its customers); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230–31 (5th Cir.1990) (news producers for a television station are not administrative employees because their job duties relate to the production of the station's product, not to administering the business affairs of the enterprise). This is clearly an issue that can be evaluated on a collective basis and, if decided in Plaintiffs' favor would defeat the application of the administrative exemption for all subclass members.

DOL regulations explain that, the "phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

20

This latter explanation by the DOL contained in § 541.201(a), has come to be known as the administrative/production dichotomy. *Blanchar v. Standard Insurance Co.*, 2012 WL 2458639 at *6 (S.D. Ind. June 27, 2012). "The distinction § 541.205(a) draws is between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990).

For example, in *Gottlieb v. Construction Services & Consultants, Inc.*, 2006 WL 5503644 (S.D. Fla. July 24, 2006), the Plaintiff was a project supervisor for the Defendant. The Court determined that the Defendant's main purpose in hiring Plaintiff and putting him on the construction site "was to inspect the work of the subcontractors to ensure that it was in compliance with the builder's plans." *Id.* at *6. In examining the "directly related" prong of the administrative exemption, the Court found that Plaintiff's work involved producing the product Defendant existed to market rather than servicing Defendant itself. "Plaintiff was not involved in 'running or servicing' [Defendant]." *Id.* The Court, thus, determined that Plaintiff's work was not "directly related" to management policies or general business operations of Defendant or its customers.

In *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688 (4th Cir. 2009), the Fourth Circuit held that "Racing Officials" employed by a racetrack did not satisfy the "directly related" prong of the Administrative Exemption. Finding the defendant "'produces' live horse races," the Fourth Circuit held that the position of Racing Official consists of "'the day-to-day carrying out of [Charles Town Gaming's] affairs' to the public, a production-side role." Notably, the plaintiff Racing Officials did not actually ride horses or race themselves. Instead, they observed and monitored the jockeys, the horses, and the race itself to be sure the correct procedures and legal requirements were followed. Therefore, the Court found a Racing Official's duties were not directly related to the general business operations of the defendant.

21

Similarly, in *Gallegos v. Equity Title Company of America, Inc.*, 484 F.Supp.2d 589 (W.D. Tex. 2007), the Court examined the exempt status of escrow officers in the escrow closing business. The Court determined that "[t]he primary business of defendants is to perform the closing service for its customers. Other than in the efficiency in which they performed their duties, escrow officers did not promote defendants' business. They did not carry out major assignments. Their job was to review documents, check for errors, contact the borrower or lender to correct discrepancies, and assure closing instructions were followed. In the escrow closing business, these functions constitute production." *Id.,* at 595. Thus, the Court found that escrow officers' duties are not directly related to the management or operation of the employer or its customers.

One of the core product/services M-I provides to its clients is drilling fluids services. Thus, M-I's DFSs, who are provided to M-I's clients as part of its drilling fluids services, are the ones who actually provide/produce that very service that M-I "exists to produce and market." *Dalheim*, 918 F.2d at 1230. Accordingly, pursuant to the administrative/production dichotomy analysis, M-I's DFSs fall on the production side of that equation and, therefore, cannot be exempt under the administrative exemption. The Fifth Circuit held as much when examining this exact same position. *Dewan v. M-I, LLC,* 858 F.3d 331, 337-38 (5th Cir. 2017) (Drilling Fluids Specialists were not engaged in tasks "likely to qualify as the general administrative work applicable to the running of any business" as is required under the administrative exemption.).

The job of M-I's DFSs is to generate (i.e., produce) the product or service that M-I's business offers to the public. As a result, in the drilling fluids services business, the functions of M-I's DFSs constitute production and thus cannot meet the "directly related" prong of the administrative exemption. Given that DFSs cannot meet the "directly related" prong of the administrative exemption, the exemption fails. However, regardless of which side of the

production/administrative dichotomy Plaintiffs' duties fall on, this determination can be made on a group basis (perhaps as to subclasses) without individual inquiries.

The Fifth Circuit in *Dewan* likewise held, in analyzing the "discretion and independent judgment as to matters of significance" prong of the administrative exemption, that "a review of the plaintiffs' responsibilities suggests that their work involved little more than 'the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources,' § 541.202(e), and that they primarily performed 'inspector-type duties' consisting of 'specialized work along standardized lines involving well-established techniques and procedures[,] which may have been catalogued and described in manuals or other sources,'" and held that M-I could not meet its summary judgment burden as to "the scope of the plaintiffs' discretionary authority and independent judgment." *Dewan*, 858 F.3d at 340.

9.     **THE HIGHLY COMPENSATED EMPLOYEE TEST DOES NOT REQUIRE INDIVIDUAL ANALYSIS**

In order to meet the Highly Compensated Employee test, M-I must prove (1) the employee earns total annual compensation of $134,004[5] or more, which includes at least $455 per week paid on a salary basis; (2) the employee's primary duty includes performing office or non-manual work; and (3) the employee customarily and regularly performs at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee. *See* 29 C.F.R. § 541.601.

As discussed above, the salary basis test can be determined on a global basis as to the entire class or subclasses. *See* Section 7, *supra*. Likewise, the "customarily and regularly performs" prong may also be determined on a global basis. M-I incorrectly suggests that it can meet this prong simply by showing that its DFSs perform one or more of the detailed listings of administrative or executive

---

[5] $100,000 for 2015 and/or 2016. $134,004 for 2017 and/or 2018. *See* Section 5.C.2), *supra*.

duties discussed in the regulations. Instead, the Highly Compensated Employee test requires M-I to prove that DFSs perform "any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601. Both the regulations and the case law agree that under the Highly Compensated Employee test, the employee must perform at least one of the enumerated exempt duties in the executive, administrative or professional exemptions, not just some generic exempt job duty. *See* 29 CFR §541.601(a) (2004 version) ("An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100. *See also Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 359–60 (5th Cir. 2015) (judging whether employee met Highly Compensated Employee test by examining whether employee met one of the enumerated exempt duties in the administrative exemption); *Ferrara v. 4JLJ, LLC*, 150 F. Supp. 3d 813, 820 (S.D. Tex. 2016) (same); *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule (2004 Preamble)*, 69 Fed. Reg. 22,173 ("an employee may qualify as a highly compensated executive employee, for example, if the employee directs the work of two or more other employees, even though the employee does not have authority to hire and fire" which are two of the enumerated exempt duties in the executive exemption). As noted above, M-I cannot prove either of the enumerated duties tests of the Administrative Exemption and that determination can be made on a global, not an individualized, basis.

**10.   CONSIDERATIONS OF FAIRNESS AND MANAGEABILITY SUPPORT COLLECTIVE DETERMINATION**

With 29 U.S.C. § 216(b), Congress affirmed that FLSA plaintiffs "should have the opportunity to proceed collectively" and that such collective actions allow the plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman La-Roche v. Sperling*, 493 U.S. 165, 170 (1989). "The judicial system [also] benefits by efficient resolution

in one proceeding of common issues of law and fact." *Id.; Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008). So even "where factors (1) and (2) weigh in favor of decertification of a provisionally certified class, the district court must balance those factors with the fundamental purpose of 29 U.S.C. § 216(b): (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Kautsch v. Premier Commc'ns*, No. 06-CV-04035-NKL, 2008 WL 294271, at *2 (W.D. Mo. Jan. 31, 2008) (internal quotes and cites omitted). And while M-I claims litigating this case in a collective action is somehow unfair, "[t]here is nothing unfair about litigating a single corporate decision in a single collective action."

This is a small collective action with only 20 opt-in Plaintiffs. If decertification were granted, one of two scenarios could occur. The first is that 20 workers could re-file individual lawsuits addressing the same basic misclassification claim. Since M-I is headquartered in this District, this Court could face dozens of individual trials and/or summary judgment motions where the same evidence of M-I's categorical classification decision would be decided over and over.

This result is contrary to Fifth Circuit precedent. *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 227 (5th Cir. 2011) ("55 separate trials would not have been justifiable under our FLSA caselaw. Section 216(b) collective actions are intended to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer."); *see also, Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1363 (S.D. Fla. 2007) (denying decertification where it would simply create a large number "of individual lawsuits all dealing with the same issue."). Having multiple lawsuits would "contravene[] the policy behind collective actions under section 216(b) of the FLSA of allowing plaintiffs to vindicate their rights with lower individual costs by pooling resources" and "would waste more judicial time and resources than trying plaintiffs' cases individually would preserve." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d

1010, 1025-26 (D. Minn. 2007); accord *Andrako v. United States Steel Corp.*, 788 F. Supp. 2d 372, 383 (W.D. Pa. 2011) ("Decertifying this case would potentially result in more than 250 individual trials, which not only is the worst possible outcome in terms of efficiency, but also would place each opt-in Plaintiff back at square one without the benefit of pooled resources to resolve the common liability questions in this case") (citations omitted);

The second possible result of decertification is that the opt-in Plaintiffs will not pursue their individual claims because of the relatively small amount in controversy and the lack of pooled resources to combat their well-funded employer. *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) ("[a]s a practical matter, plaintiffs can hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action"); *Pendlebury,* 518 F. Supp. 2d at 1363 ("Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases"). Thus, "[g]iven the substantial similarity of the class members' jobs and uniform corporate treatment of the [employees as independent contractors], it would not serve the interest of judicial economy to require these overtime-pay claims to be adjudicated in [] individual trials." *Morgan*, 551 F.3d at 1265. In sum: "Decertifying this class would be contrary to both of the purposes of Section 216 of the FLSA." *Falcon*, 580 F. Supp. 2d at 541.

M-I's motion for decertification should be denied.

Respectfully submitted,

Michael A. Josephson
Texas Bar No. 24014780
Andrew W. Dunlap
Texas Bar No. 24078444
**JOSEPHSON DUNLAP LAW FIRM**
11 Greenway Plaza, Ste. 3050
Houston, Texas 77046
Telephone:      (713) 352-1100
Telecopier:     (713) 352-3300
mjosephson@mybackwages.com

adunlap@mybackwages.com

AND

By: */s/ Rex Burch*
Richard J. (Rex) Burch
Texas Bar No. 24001807
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:      (713) 877-8788
Telecopier:      (713) 877-8065
rburch@brucknerburch.com

**Attorneys for Plaintiff**

### CERTIFICATE OF SERVICE

On September 20, 2019, I served a copy of this document on all registered parties and/or their counsel of record, via the Court's CM/ECF system.

*/s/ Andrew W. Dunlap*
Andrew W. Dunlap